**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

VETcorp, Inc.                       *

v.                              *         Civil Action No. CCB-14-4025

Mid-Atlantic Salt, LLC         *

                                *

                            ***

## Memorandum

The plaintiff, VETcorp, Inc. (VET), has sued the defendant Mid-Atlantic Salt, LLC

(MAS), for breaching two subcontracts by failing to supply road salt as required under the

agreements.[1] In response, MAS has filed a motion for summary judgment as to all counts, and

partial summary judgment to limit the scope of damages if VET were to succeed on its claims.

MAS also has counter-sued VET for unpaid invoices. For the reasons stated below, MAS's

motion will be denied in part and granted in part.

## Background

For five years, from 2008 to 2013, VET and MAS dealt in road salt—VET as buyer and

MAS as seller—without incident. (ECF No. 68, "Def.'s Mot.," Wick Decl., Benoit Dep. p. 29).

But their business together was relatively minor, totaling around $1.2 million over five years. (*Id.*

at p. 30). That changed in the fall of 2013 when VET entered a bid to supply Montgomery

County with road salt for the upcoming winter.[2] (*Id.* at Knutsen Dep., Ex. 1). To prepare its bid,

VET asked MAS to provide a price quote for supplying the Montgomery County contract.

(Def.'s Mot., Stein Decl., Ex. 1). And MAS did, telling VET that it could supply the contract,

---

[1] The plaintiff concedes that Count III of the amended complaint, a claim for detrimental reliance, should be
dismissed because it is subsumed within the claims in Counts I and II.

[2] The bid contract consisted of three different zones within and without Montgomery County. Here, only Zone One
matters, as VET only bid to supply that zone. (Def.'s Mot, Wick Decl., Knutsen Dep., Ex. 1 at E-2).

"which could approximate 100,000 tons" of salt, with a price per ton of $53.50. (*Id.* at Ex. 3). MAS added, "[i]f you win the bid, [we] will follow with a formal written quote as we typically do for Vet Corp." (*Id.*).

VET submitted a bid to Montgomery County, offering a delivery price of $56.18 per ton of salt, (Def.'s Mot., Wick Decl., Knutsen Dep. Ex. 1 at E-2), the second-lowest bid the County received, (Stein Decl. Ex. 4). Although losing out on the primary contract, VET became a secondary supplier, and the company informed MAS that it would be called on only if the primary contractor could not perform. (Stein Decl., Ex. 5). The companies prepared delivery terms anyway, though they were unable to reach an agreement. (*See id.* at ¶ 9, Ex. 6). And MAS never provided the formal quote it said it would if VET won the County's contract.

Also in the fall of 2013, VET contacted MAS with a second business inquiry. VET had been awarded a contract from the U.S. Department of the Interior, National Park Service, by using a price quote from one of MAS's competitors, and VET wanted to know if MAS would match its competitor's bid. MAS was provided with its competitor's "quote sheet," which included delivery prices and an estimated total tonnage of 5,350. (*Id.* at Ex. 7). MAS agreed to match the price quote. Other terms, such as the manner of delivery and payment, were left unstated. (Wick Decl., Benoit Dep., at pp. 110-11). Eventually, MAS submitted quote sheets for several of the delivery locations on the competitor's quote that VET signed and returned. (Stein Decl. at ¶ 19, Ex. 17).

Then a severe Mid-Atlantic winter arrived and significantly burdened MAS's salt supply. (*Id.* at ¶ 12). VET submitted three orders for salt to MAS over December 2013 and January 2014 under its contract with Montgomery County, specifying the $53.50 per ton price MAS quoted,

each of which was filled by MAS. (*Id.* at ¶ 16). VET also submitted around a dozen orders under the NPS contract during the same period, which MAS also filled for the price quoted to VET. (Pl.'s Opp., ECF No. 70, Benoit Decl. at ¶ 28).

On February 3, 2014, however, MAS contacted its business partners, including VET, to let them know that its supply of salt in Baltimore was depleted, but it was expecting a new shipment of salt around February 21st. (Def.'s Mot., Stein Decl. at ¶ 12). The shipment did not arrive until March 6th. (*Id.* at ¶ 15). As a result, several of VET's orders under both the Montgomery County and NPS contracts were left unfilled. (*Id.* at Ex. 14; Pl.'s Opp., Benoit Decl. at ¶¶ 19, 29). Although NPS cancelled its pending orders with VET, and VET then cancelled all its pending NPS contract orders with MAS,[3] (Pl.'s Opp., Benoit Decl. at ¶ 30), VET still sought to fill its orders under the Montgomery County contract, (Def.'s Mot., Stein Decl. at ¶ 17, Ex. 15). The orders were never filled. After MAS received salt in March, it attempted to raise the price per ton of salt, arguing that the quote VET received for the Montgomery County contract was not binding because the parties never formalized it. (*Id.* at ¶ 18, Ex. 16). The parties were unable to resolve their dispute over pricing, and, sometime later, VET and Montgomery County mutually terminated their contract. (Def.'s Mot, Wick Decl., Knutsen Dep. at pp. 50-53). VET was not sued by either Montgomery County or NPS. (Def.'s Mot. Wick Decl., Benoit Dep. at pp. 144-47). After the winter season, it is undisputed that VET began withholding outstanding payments owed to MAS amounting to $95,984.50. (*Id.* at pp. 181-82).

VET brought suit in state court alleging breach of the parties' agreements under both the Montgomery County and NPS contracts. (ECF No. 2). The case was removed to federal court in

---

[3] Eventually, NPS terminated its contract with VET, and VET did not suffer a legal consequence. (Def.'s Mot., Wick Decl., Benoit Dep., at pp. 144-45).

December 2014. (ECF No. 1). After VET amended its complaint, (ECF No. 24), MAS filed a counterclaim against VET for unpaid invoices, (ECF No. 36). MAS now moves for summary judgment on all of VET's claims, and its counterclaim, and partial summary judgment as to the scope of damages. (ECF No. 68).

**Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

**Analysis**

MAS argues that summary judgment should be granted in its favor because: (1) the parties never entered into a contract under either the Montgomery County or the NPS bid; and (2) it is undisputed that VET has withheld payment owed to MAS. MAS's motion will be granted in part and denied in part. VET will be ordered to pay MAS the money it has been withholding. But because the existence of the contracts between the parties is materially disputed, summary judgment on these claims will be denied.

I.        Breach of Contract

Among other elements, a valid contract is formed by an offer and acceptance and consideration. Acceptance is demonstrated by "an actual meeting of the minds regarding contract formation." *Cochran v. Norkunas*, 919 A.2d 700, 713 (Md. 2007). "Acceptance may be manifested by acts as well as by words." *Id.* And an offer is any communication that a party intends, if accepted, "to create an enforceable arrangement." *Audio Visual Associates, Inc. v. Sharp Electronics Corp.*, 210 F.3d 254, 259 (4th Cir. 2000) (applying Maryland law).

A.  Montgomery County

MAS provides three reasons for why the parties here never entered a contract as to the Montgomery County bid: (1) MAS never issued a quote, so there could be no offer; (2) even if MAS did issue a quote, the quote does not constitute an offer; and (3) even if MAS issued a quote and the quote constitutes an offer, the contract lacked consideration. Because there is at least a genuine dispute as to each of these issues, MAS's motion for summary judgment as to this claim will be denied.

A.

Taking the first two arguments together, there is no doubt MAS issued a quote to VET and that the quote constituted an offer. VET came to MAS with a competitive bidding project, asked the company to provide a price for the project so that it could accurately provide a cost estimate to Montgomery County, and MAS provided a price. Now MAS is surprised that VET believed the price it was provided was a quote. But of course a general contractor that submits a bid, after receiving a price for performance under the contract from a subcontractor, and pricing in a profit, is not worried that it will be forced to perform at a loss because the subcontractor has changed its price. The very purpose of shopping a project to potential subcontractors is to reduce uncertainty. The general contractor seeks to be assured of the cost of the subcontract so that it may be assured that its bid will provide a profit. And a general contractor that does all this, as VET did, does not receive news that it won a bid with fingers crossed. Indeed, Maryland courts have said as much, noting the many ways a sub-bid (here called a price quote) might constitute an offer, *Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 526-30 (Md. 1996),[4] and singling out one particularly popular justification:

> "When [the general contractor] used defendant's offer in computing his own bid, he bound himself to perform in reliance on defendant's terms. Though defendant did not bargain for the use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract . . . . It was to its own interest that the contractor be awarded the general contract; the lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater its chance of acceptance and hence the greater defendant's chance of

---

[4] To be sure, the *Pavel* court ultimately found that there was no "meeting of the minds" between the parties, but only because there was no acceptance—the general contractor was communicating with several subcontractors at once and there was evidence the defendant subcontractor had revoked its offer before the plaintiff general contractor accepted. *Pavel*, 674 A.2d at 531. The court, however, found that the sub-bid was a "clear and definite" offer. *Id.* at 530.

> getting the . . . subcontract. Defendant had reason not only to expect plaintiff to
> rely on its bid but to want him to."

*Id.* at 527. Price quotes may not generally be "offers that can be accepted to form binding

contracts," but when made in the bid-contract setting, the quote becomes more than an intention

to agree, *see Audio Visual*, 210 F.3d at 259, it may very well become the agreement itself.

Here, a reasonable jury could find that MAS's price quote was an offer. MAS knew it

might form the foundation of VET's bid submission. Nor is there evidence that VET shopped for

bids, let alone that MAS *knew* VET had shopped for bids, such that MAS would have been

justified in doubting that its quote would be relied upon.

Further still, the parties' post-bid conduct supports the existence of a contract. VET made

orders under the quote MAS provided, and MAS filled those orders without raising an issue

*three times*. To be sure, MAS eventually tried to raise its price, but the circumstances of its

changed position—that the company had run out of salt and was struggling to fill orders—raises

doubt as to whether MAS's sudden price change was due to a new understanding of its

relationship with VET, or rather to a desire to seize the business opportunity presented by

growing demand and a shrinking supply of salt. Thus, not only could a jury find that MAS

provided VET with a quote, it could also find that the quote constituted an offer.

Insistent that there is no dispute here, MAS argues that even if the quote were an offer it

was rescinded once VET failed to win the position of primary supplier to Montgomery County

because the quote was premised on the expectation of selling 100,000 tons of salt. But it is not at

all clear that moving 100,000 tons of salt was a condition of the quote, especially as MAS also

argues that 100,000 tons of salt represents nearly twice the amount it usually holds in Baltimore

for *all* customers, and therefore may have been unmanageable. There is also the fact that the

project proposal VET sent to MAS only said the contract could require *up to* 100,000 tons of salt, and MAS ultimately provided salt to VET, totaling significantly less than 100,000 tons of salt, under the Montgomery County contract for the price it quoted.[5] But even if none of this were true, there is still MAS's reaction to discovering that VET was only awarded the secondary contract: "That is fantastic news and as you might expect [we] are anxious to find out the details as well. Great job gentleman!" (Pl.'s Opp., ECF No. 70, Ex. 13).[6] Hardly the reaction one would expect from a company who allegedly just learned of unacceptable contract terms.[7]

MAS also argues that the quote was not an offer because it told VET that if it won the bid it would provide a "formal" quote and because missing terms from the quote indicate that the parties did not intend for it to form the foundation of a contract. But it is not at all likely that by "formal quote" MAS meant VET could not rely on the price provided in the "informal" quote, for the reasons concerning the nature of bid contracts already stated. Indeed, it is more likely that the phrase referred to the form, rather than the substance, of the quote—because VET gave MAS short notice of the Montgomery County contract it provided an informal, email quote, and that if VET won it would receive a formal "quote sheet" of the sort provided for the NPS contract. And if that is true, there is no reason to doubt that the price in the informal quote represented an offer.

As for the missing terms, that fact by itself does not demonstrate that the parties did not reach an agreement. Maryland law has it that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." MD. CODE ANN., COM. LAW § 2-204(1).

---

[5] In addition, when MAS was considering how to fill an outstanding order, one of its managers acknowledged that a contract existed between the parties: "The fundamental problem we have now is . . . not honoring a contract." (Pl.'s Opp., ECF No. 70, Ex. 24).

[6] MAS does not challenge either contract for lack of definiteness.

[7] The parties then began negotiating terms such as the manner of delivery, suggesting that VET's secondary position was not a deal breaker and that the parties considered the price per ton of salt was a settled variable.

MAS also suggests that, even if it did offer to supply VET with salt for the Montgomery County contract, VET never accepted the offer. True, there is no evidence that VET ever said "I accept," but under Maryland law acceptance may be evidenced by acts as well as words. And here VET not only relied on MAS's price quote when submitting a bid for the Montgomery County project, but followed up with MAS after it discovered it would be a secondary provider to the County, suggesting, however implicitly, that VET expected to work with MAS on the project.

To be sure, VET's conduct with respect to the NPS contract—after winning the NPS contract, VET asked MAS to match the price quote from the first subcontractor the company approached—indicates that VET does not treat every reliance on a price quote in a bid as an acceptance. But VET's prior business relationship with MAS—a relationship which there is no evidence VET shared with the subcontractor it rejected in the NPS contract—may make the difference here. Indeed, VET claims that past business between the parties was conducted in the exact same manner the parties did business under the Montgomery County contract. Thus, a jury could reasonably find that a pattern of past practice indicates that every time VET relied on MAS's price quote it intended to accept MAS's offer.

### B.

Moving away from whether a contract existed to what the contract said, MAS argues that even if there were mutual assent between the parties, a valid contract was still not formed because VET was not bound to provide MAS any benefit. That is so, MAS claims, because the contract does not require VET to purchase salt exclusively from MAS, but rather may have used any number of suppliers to meet its obligations to Montgomery County.

9

VET concedes that MAS is correct that the contract lacked formal consideration, but insists an enforceable contract exists nevertheless by virtue of the doctrine of detrimental reliance. In Maryland, a contract that lacks consideration can be saved if the plaintiff detrimentally relied on the assumption that a valid contract existed between the parties.[8] To prove detrimental reliance, a plaintiff must provide evidence: "(1) [of] a clear and definite promise; (2) . . . [that] the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise." *Pavel*, 674 A.2d at 532. These factors require a fact-based, case-by-case inquiry, *id.* at 533, but a court's analysis should be guided by at least three principles. First, evidence that the general contractor bid-shopped is evidence that the general contractor did not rely on the subcontractor's bid. *Id.* Second, a "subcontractor's expectation that the general contractor will rely upon the sub-bid may dissipate through time." *Id.* And third, when considering whether the general contractor suffered a detriment, the court should determine whether the general contractor has "clean hands" and did not engage in bid-shopping. *Id.* at 533-34.[9]

For the reasons already stated, a reasonable jury could find that the first three elements of detrimental reliance have been met. MAS's price quote was a clear and definite promise to provide salt at a set price, it was reasonable for MAS to expect VET to rely on its promise, and VET actually did rely on it. So too could a reasonable jury find that VET was prejudiced by its

---

[8] Detrimental reliance also may act as a substitute for formal acceptance of an offer. *See Pavel*, 674 A.2d at 530. As further discussed below, a reasonable jury could find that VET detrimentally relied on MAS's offer, and thus also could find that VET accepted MAS's offer on that ground.

[9] In *Pavel* the Maryland Court of Appeals determined that these factors had not been met. There was evidence that a reasonable subcontractor would not have expected that the general contractor would rely on its offer because of a significant time gap between when the bid opened and the award, and the general contractor may not have relied on the subcontractor price quote because it sought quotes from several subcontractors. *Pavel*, 674 A.2d at 533-34. Neither factor is relevant to this case.

reliance on MAS's price quote, despite MAS's arguments to the contrary. Although Montgomery County did not seek damages for VET's failure to perform, and there is nothing to suggest that VET attempted to buy salt at a higher price from another supplier, still left is VET's lost profit, the money it would have earned had MAS supplied the salt and VET been able to perform under its contract with Montgomery County, an undisputed detriment that a reasonable jury could find VET suffered.

Finally, MAS insists that even if the parties did mutually assent to an agreement, and even if VET's detrimental reliance on its offer supplies consideration to an otherwise unlawful contract, VET cannot recover money damages because the doctrine limits a plaintiff's relief to specific performance. Not so; Maryland courts have awarded money damages where, as here, a general contractor has detrimentally relied on a subcontractor's price quote. *See*, *Citiroof Corp. v. Tech Contracting Co., Inc.*, 860 A.2d 425, 431, 434 (Md. Ct. Spec. App. 2004) (affirming $20,276 in damages); *see also Dierker v. Eagle Nat. Bank*, 888 F. Supp. 2d 645, 653-54, 656-58 (D. Md. 2012) (assuming that detrimental reliance could be the foundation for money damages).[10] Nor does the Restatement (Second) of Contracts, from where *Pavel* derived its test, take the defendant's view. The Restatement recognizes that "[a] promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate." Restatement (Second) of Contracts § 90 cmt. d (Am. Law Inst. 1981). Money damages are available to VET.

---

[10] In *Abt Associates, Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523 (D. Md. 2000), the District Court of Maryland reached the opposite conclusion, holding that a plaintiff that relies on the doctrine of detrimental reliance (there called promissory estoppel) could not recover money damages. 104 F. Supp. 2d at 536. The court's opinion, however, placed too much stock on the fourth element of the *Pavel* test which states that a promise must "cause[] a detriment which can only be avoided by the *enforcement of the promise*." *Pavel*, 674 A.2d at 532 (emphasis added). The *Abt* court interpreted "enforcement of the promise" to mean the doctrine of detrimental reliance limits a plaintiff's remedies to specific performance, but a better reading of the element, indeed the one adopted by Maryland courts, is that the "enforcement of the promise" refers generally to treating the parties' agreement as a normal contract, and not as a limitation on remedies.

In sum, a reasonable jury could find that VET satisfied all four elements of the test for detrimental reliance, and thus should be awarded damages despite conceding a lack of consideration.

B. NPS Contract

MAS's arguments as to the NPS contract mirror those just considered, but here, in addition to many of the reasons stated above, MAS's position is further weakened by strong evidence of MAS's offer and VET's acceptance.

MAS asserts again that the price quote it gave to VET, to match a quote from a competing salt supplier, was not an offer. But that makes little sense, as the only reason VET would ask MAS to match its competitor and for MAS to do so, is if both parties understood that they would do business together afterward in reliance on the quote. Why else would MAS submit the price quote VET requested? Certainly not to negotiate as only one offer, one that matches its competitor, would make sense for MAS to make—any higher and MAS would lose the business, any lower and MAS puzzlingly gives VET more than it asked for. Moreover, MAS eventually provided VET a price quote sheet that VET signed and returned, further evidence that the parties were not dealing in hypotheticals.

In addition, as with the Montgomery County Contract, MAS acted as if it were bound by the contract VET alleges, filling nearly a dozen orders under the matched price quote until its salt ran out. A reasonable jury could certainly find that, in addition to all the reasons explained above related to the Montgomery County Contract, the only reason MAS would submit a price quote for signature, VET would sign the price quote, and MAS would fill about twelve orders under the price quote it provided, is if the parties believed the price quote was an offer and VET's signature constituted acceptance. Finally, for the same reasons set forth above, a reasonable jury

could find that the doctrine of detrimental reliance supplies whatever consideration was missing from the parties' agreement.

II.     Counter-Claim

In addition to its motion for summary judgment, MAS has filed a counter-claim against VET for unpaid invoices amounting to $95,984.50, plus pre-judgment interest. VET does not dispute that it owes MAS this money, but does argue that it has the right to "set-off" MAS's claim against its claims for damages. VET also disputes the defendant's request for pre-judgment interest.

The only case the plaintiff cites to support its right to "set-off" MAS's claim is *Cockey v. Hospelhorn*, 11 A.2d 466 (Md. 1940), a case cited only once by Maryland courts in the 80 years since it was decided.[11] The *Cockey* court held that where the parties owed one another "mutual debts . . . that is, debts of the same kind and quality" currently due, they may be set-off against each other. *See Cockey*, 11 A.2d at 467, 469-70 ("Since . . . there was due from [appellee] to appellants the sum of $23,186.21, and at the same time there was due appellee from appellants $8,587.79, those debts were mutual, being of the same kind and quality.") Besides *Cockey*'s dubious precedential value, Maryland courts have not treated a *potential* legal judgment for damages, unrelated to money already owed, as a "debt" that may be set-off. *See, e.g.*, *Carpenter Realty Corp. v. Imbesi*, 801 A.2d 1018, 1019-20 (Md. 2002) (considering a claim for set-off in the context of opposing claims for money allegedly already owed). That makes good sense since a claim for damages does not, and may never, provide a "debt" to set-off. Indeed the very purpose of this suit is to determine whether MAS must pay VET anything at all. It is certain,

---

[11] *Cockey* was cited in *Bierman v. Hunter*, 988 A.2d 530 (Md. Ct. Spec. App. 2010) but not for its holding on "set-offs." 988 A.2d at 542.

indeed undisputed, that VET owes MAS $95,984.50 in unpaid invoices, however. Thus, judgment will be granted in MAS's favor in that amount.

The plaintiff also will be ordered to pay MAS pre-judgment interest. Although pre-judgment interest is "the exception rather than the rule," it is available "as a matter of right when the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding of the payment was to deprive the creditor of the use of a fixed amount as of a known date." *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 777-78 (Md. 2004); *see also Buxton v. Buxton*, 770 A.2d 152, 165 (Md. 2001) ("[T]he right to pre-judgment interest as of course arises under written contracts to pay money on a day certain.") Because it is undisputed that VET's "obligation to [pay MAS] . . . had become certain" before entering summary judgment in MAS's favor, prejudgment interest, calculated at the appropriate rate, is available to MAS as a matter of right. *Ver Brycke*, 843 A.2d at 777-78.

III.     Damages

Finally, MAS requests that the court define the scope of damages VET may be awarded if a jury were to find in its favor. Here too the parties are in disagreement.

Their dispute turns on the proper interpretation of MD. CODE ANN., COM. LAW § 2-713 which states that "the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this title (§ 2-715), but less expenses saved in consequence of the seller's breach." MD. CODE ANN., COM. LAW § 2-713(1). MAS asserts that this statute should not apply to circumstances in which an aggrieved

14

buyer was bound by a third-party contract to resell the goods at a fixed price because the buyer would receive damages in excess of what it may have expected if the seller had performed. The defendant's position is bolstered by another provision of the Maryland Commercial Code which states that available remedies under the Code "shall be liberally administered to the end that the aggrieved party *may be put in as good a position as if the other party had fully performed*." MD. CODE ANN., COM. LAW § 1-305(1) (emphasis added). Neither party disputes that applying § 2-713 would put VET in a *better* position than it would have been had MAS performed.

Maryland courts have not yet had the opportunity to decide whether § 2-713 applies in the circumstances presented by this case.[12] Thus, considering that the question of damages presented here implicates a novel issue of Maryland law, and may be necessary to the resolution of this suit, the court will request the parties to provide additional briefing on whether the question should be certified to the Maryland Court of Appeals. *See Stahle v. CTS Corp.*, 817 F.3d 96, 114 (4th Cir. 2016) (citing approvingly the holding that "certification is appropriate when [the court is] required to address a novel issue of local law which is determinative in the case before [it]."); *see also* MD. CODE ANN., CTS. & JUD. PROC. § 12-603 ("The Court of Appeals of [Maryland] may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State.")

---

[12] Nor have other courts, either federal or state, provided clear guidance on the issue. *Compare Tongish v. Thomas*, 840 P.2d 471, 473-74 (Kan. 1992), *and TexPar Energy, Inc. v. Murphy Oil USA, Inc.*, 45 F.3d 1111, 1113-14 (7th Cir. 1995), *with H-W-H Cattle Co., Inc. v. Schroeder*, 767 F.2d 437, 439-40 (8th Cir. 1985), *and Allied Canners & Packers, Inc. v. Victor Packing Co.*, 162 Cal. App. 3d 905, 912-15 (Cal. Ct. App. 1984).

**Conclusion**

For the reasons stated above, the defendant's motion for summary judgment will be granted as to its counter-claim, but denied as to Counts I and II of the amended complaint. Count III will be dismissed. The parties will be directed to provide their positions as to whether the court should certify the question of damages to the Maryland Court of Appeals. A separate Order follows.


_____May 29, 2018_____                          _____/s/_____
          Date                                                    Catherine C. Blake
                                                                United States District Judge